**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

OCT 20 2026 PM1:05
FILED - USDC - FLMD - TPA

KIRTI M. MAKATI,

Plaintiff,

v.

Case No.: 8:26-CV-3185-TPB-AAS

NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING; and THE BANK OF NEW YORK MELLON, f/k/a THE BANK OF NEW YORK, as successor in interest to JPMorgan Chase Bank, N.A., as Trustee for Structured Asset Mortgage Investments II Inc., Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2005-7,

Defendants.
_________________________________/

## COMPLAINT

Plaintiff, Kirti M. Makati, appearing pro se, sues Defendants NewRez LLC d/b/a Shellpoint Mortgage Servicing and The Bank of New York Mellon, as Trustee, and alleges:

## INTRODUCTION

1. This is a mortgage-servicing case about one misapplied payment and what the servicers did after Plaintiff disputed it.

2. On March 29, 2024, the loan's prior servicer, Specialized Loan Servicing LLC ("SLS"), posted $1,539.33 of Plaintiff's monthly mortgage



TPA 75071
$405.00

payment to principal instead of to his next monthly installment. Plaintiff never asked for a principal prepayment. The posting left the account one additional month behind.

3. Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") took over servicing in July 2024. Plaintiff disputed the account in writing. In August 2024, Shellpoint described the principal posting and refused to correct it. Shellpoint did not reverse the posting until March 31, 2025. Meanwhile, Shellpoint treated the loan as in default, reported Plaintiff to credit reporting agencies as late while his dispute was pending, threatened foreclosure, and charged property-inspection fees that the extra month of delinquency triggered—and later took Plaintiff's own money to pay them.

4. On October 12, 2026, in response to Plaintiff's latest written dispute, Shellpoint told Plaintiff that "there are no outstanding late fees currently." The loan history enclosed with the same letter shows a late-charge balance of $731.20.

5. Plaintiff brings claims under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 ("RESPA"), and its implementing Regulation X, 12 C.F.R. Part 1024; for breach of the Note and Mortgage; and under the Florida Consumer Collection Practices Act, Fla. Stat. § 559.72 ("FCCPA").

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 12 U.S.C. § 2614 because Count I arises under federal law.

7. This Court has supplemental jurisdiction over Counts II and III under 28 U.S.C. § 1367(a) because they arise from the same loan, the same payments, and the same servicing conduct as the federal claims.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the mortgaged property is in Hillsborough County, Florida, and a substantial part of the events giving rise to the claims occurred here. Hillsborough County lies in the Tampa Division.

## PARTIES

9. Plaintiff Kirti M. Makati is a natural person who owns and lives at 14314 North Boulevard, Tampa, Florida 33613 (the "Property"). The Property is Plaintiff's primary residence. Plaintiff is 67 years old.

10. Defendant NewRez LLC does business as Shellpoint Mortgage Servicing. Shellpoint has serviced Plaintiff's mortgage loan since July 2024. Shellpoint has stated in writing that, effective May 1, 2024, SLS merged into NewRez LLC d/b/a Shellpoint Mortgage Servicing. (Ex. 7.) As SLS's successor by merger, Shellpoint is responsible for SLS's conduct described in this Complaint.

11. Defendant The Bank of New York Mellon, f/k/a The Bank of New York, as successor in interest to JPMorgan Chase Bank, N.A., as Trustee for Structured Asset Mortgage Investments II Inc., Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2005-7 ("BNY Mellon"), is the owner of Plaintiff's loan, as Shellpoint has stated in writing. (Ex. 4.) BNY Mellon acts through its loan servicers, SLS and Shellpoint.

## FACTUAL ALLEGATIONS

### A. The Loan Documents

12. On June 2, 2005, Plaintiff signed an Adjustable Rate Note for $176,800 (the "Note"). (Ex. 1.) The Note is secured by a Mortgage on the Property recorded on June 13, 2005, in Official Records Book 15115, Page 1617, of the public records of Hillsborough County, Florida (the "Mortgage"). (Ex. 2.) The Mortgage is the Florida Fannie Mae/Freddie Mac Uniform Instrument, Form 3010.

13. Section 5 of the Note governs prepayments. It provides that "[w]hen I make a Prepayment, I will tell the Note Holder in writing that I am doing so," and that "I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note." (Ex. 1.)

14. Section 7(A) of the Note allows a late charge only if the Note Holder "has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due." (Ex. 1.)

15. Section 2 of the Mortgage requires that payments "be applied to each Periodic Payment in the order in which it became due," with any remaining amounts applied "first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note." It further provides that "[v]oluntary prepayments shall be applied . . . as described in the Note." (Ex. 2.)

16. Section 1 of the Mortgage allows the lender to hold a payment that is insufficient to bring the loan current as unapplied funds, but provides: "If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower." (Ex. 2.)

17. Section 14 of the Mortgage permits fees for "services performed in connection with Borrower's default," including property-inspection fees. (Ex. 2.)

18. Section 20 of the Mortgage provides that the Loan Servicer collects payments and "performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law." (Ex. 2.)

19. A prior foreclosure action on the loan, The Bank of New York Mellon v. Makati, Case No. 13-CA-003115 (Fla. 13th Jud. Cir.), was resolved in 2018. On August 8, 2018, Plaintiff reinstated the loan in full. On August 16, 2018, on BNY Mellon's own motion, the state court vacated its judgment and dismissed the

action. (Ex. 3; Ex. 11.) Since at least August 2023, Plaintiff has paid the loan each month by scheduled bank bill pay. (Ex. 6.)

**B. SLS Posts Plaintiff's Payment to Principal (March 2024)**

20. By an Escrow Account Disclosure Statement dated January 9, 2024, SLS increased Plaintiff's monthly payment from $1,560.44 to $1,716.27, effective March 1, 2024. (Ex. 5.)

21. Plaintiff's bank bill pay sent $1,660.23 in each of the payments debited from his account on February 29, March 29, April 30, and May 30, 2024—$56.04 less than the new monthly amount. Beginning with the payment debited June 28, 2024, the bill pay sent $1,716.27. (Ex. 6.)

22. According to Shellpoint, SLS received the March 1, 2024 payment and held it as unapplied funds. (Ex. 7.)

23. On March 29, 2024, SLS received Plaintiff's next payment of $1,660.23. SLS used $56.04 of it, together with the held funds, to pay the March 1, 2024 installment. SLS then posted $1,539.33 of the payment to principal "per SLS posting rules." (Ex. 7.) Shellpoint's letter does not account for the remaining $64.86 of that payment.

24. Plaintiff did not tell SLS in writing, or in any other way, that he was making a principal prepayment. The $1,539.33 was part of Plaintiff's regular monthly payment and should have been applied to the April 1, 2024 installment.

25. Plaintiff's four short payments, debited February 29 through May 30, 2024, and totaling $224.16, would by themselves have left the account about one installment behind. The $1,539.33 that SLS posted to principal far exceeded that shortfall. Because SLS diverted $1,539.33 to principal instead of holding it for the April 1, 2024 installment, the account was carried a second installment behind—about 60 days delinquent instead of about 30—and each installment after that was credited about one month later than it otherwise would have been.

26. When Shellpoint began servicing the loan in July 2024, the records it received showed the loan due for the June 1, 2024 installment, with $1,604.19 of Plaintiff's money held as unapplied funds and a late-charge balance of $258.58. (Ex. 7.)

**C. Shellpoint Treats the Loan as in Default**

27. Shellpoint sent Plaintiff notices dated on or about August 16, 2024, and September 16, 2024, stating that the loan was in default, demanding $2,099.93 "to cure the default," and warning of acceleration and foreclosure. At the same time, Shellpoint was holding $1,586.11 and then $1,568.03 of Plaintiff's money as unapplied funds. (Ex. 9.)

28. Shellpoint's policy, as stated in its August 27, 2024 letter, is to inspect a property when a loan becomes 45 days delinquent and every 30 days after that. (Ex. 7.) On Shellpoint's records, the loan first reached the 45-day trigger in July

2024; it was 59 days past due when the first inspection fee posted on July 30, 2024, and inspections then recurred about every 30 days while the loan remained more than 30 days past due. Without the misapplication, the loan would have remained fewer than 30 days past due throughout this period, and the 45-day trigger would never have been reached. Because of the extra month of delinquency, Shellpoint charged Plaintiff property-inspection fees of $13.00 (July 30, 2024), $13.00 (October 24, 2024), $13.00 (November 20, 2024), $17.00 (December 20, 2024), $30.00 (January 9, 2025), and $30.00 (February 10, 2025), and a further $30.00 on April 15, 2025 (see ¶ 39), totaling $146.00. (Ex. 11.)

29. Shellpoint also assessed monthly late charges beginning in October 2024. (Ex. 11.) This action does not seek recovery of those monthly late charges. It seeks the inspection fees, default treatment, loss of use of funds, and other harm caused by the extra month of delinquency that SLS's posting created and Shellpoint refused to correct.

30. Between August 2024 and October 2026, Shellpoint sent Plaintiff dozens of emails titled "We have no record of your payment," although Plaintiff's bank sent a payment to Shellpoint every month during that period. (Ex. 6; Ex. 13.)

**D. Plaintiff's Written Disputes and Shellpoint's Responses**

31. In July 2024, Plaintiff sent Shellpoint written correspondence disputing the late charges and the credit reporting on his account. Shellpoint states

that it received this correspondence on July 19, 2024. (Ex. 7.) On August 2, 2024, Shellpoint notified Plaintiff that it was taking additional time to respond. (Ex. 8.)

32. Shellpoint responded on August 27, 2024. (Ex. 7.) Its response described SLS's March 29, 2024 posting of $1,539.33 to principal, but Shellpoint did not correct it. Instead, Shellpoint concluded that the loan was due for the July 1 and August 1, 2024 installments. The same letter stated: "The loan will be reported as past due for July 2024, in our credit file sent this month." (Ex. 7.) Plaintiff's July 2024 correspondence disputed his payments and the credit reporting on his account, and Shellpoint had received it less than 60 days earlier.

33. Shellpoint also received written correspondence from Plaintiff on July 8, 2024. On September 1, 2024, Shellpoint refused to investigate it, stating that it had "already responded" to the same or similar correspondence. (Ex. 8.)

34. On or about October 1, 2024, Plaintiff sent Shellpoint another written notice disputing the application of his payments and attaching proof of his payments. Shellpoint did not treat the notice as duplicative of earlier correspondence; on October 28, 2024, it notified Plaintiff that it was taking additional time to respond. (Ex. 8.)

35. Under 12 C.F.R. § 1024.35(e)(3), Shellpoint had 30 business days to respond to that notice, which it received on or about October 1, 2024, extendable once by 15 business days. Its deadline was therefore no later than about December

6, 2024. Even measured from October 28, 2024, the date of Shellpoint's extension notice acknowledging receipt, the extended deadline was January 3, 2025.

36. Shellpoint did not respond until January 14, 2025, when it sent Plaintiff a secure electronic message in response—more than a month after the deadline. That response did not correct the misapplied payment.

37. On March 31, 2025, Shellpoint finally reversed SLS's principal posting. In its August 5, 2025 response to Plaintiff's complaint to the Consumer Financial Protection Bureau (Complaint ID 250721-22496921), Shellpoint stated: "A payment made on March 29, 2024 was posted as a principal-only payment while your loan was serviced by SLS. Those funds were reversed and reposted in the unapplied balance and subsequently to pay the April 1 2024 payment." (Ex. 10.)

38. After that correction, and after Plaintiff made an additional payment of $763.44 on April 10, 2025, the account was current. (Ex. 6; Ex. 11.)

39. Shellpoint did not reverse the property-inspection fees that accrued while the misapplied payment stood. On or about April 7, 2025—after its own March 31 correction, when the account was at most seven days past due, far short of the 45 days that triggers an inspection under Shellpoint's own policy—Shellpoint ordered another property inspection and charged Plaintiff $30.00 for it on April 15, 2025. (Ex. 11.)

40. On August 29, 2025, Shellpoint took $1,335.43 of Plaintiff's unapplied funds and applied $883.53 to late charges, $146.00 to the property-inspection fees described in ¶ 28, and the remaining $305.90 to principal. (Ex. 11.)

41. Plaintiff also complained to the Florida Office of Financial Regulation (Complaint Activity No. 130839) in July 2025. The Office acknowledged the complaint on July 23, 2025. (Ex. 12.)

42. On September 14, 2026, Plaintiff sent Shellpoint a written notice disputing all fees and charges on his account, asking for a breakdown of each fee, reversal and refund of erroneous fees, and recalculation of the account. (Ex. 11.)

43. Shellpoint responded on October 12, 2026. (Ex. 11.) It stated: "The late fee balance has been paid and there are no outstanding late fees currently." The Loan History Statement enclosed with that same letter shows a late-charge balance of $731.20. (Ex. 11.) That figure equals the late charges the same letter itself lists for September 2025 through September 2026 ($791.50), less a $60.30 waiver.

44. The October 12, 2026 response stated that "[n]o additional fee reversals, refunds, payment adjustments, escrow recalculations, or account credits were identified as due." It did not address the 2024 principal posting or the property-inspection fees that resulted from it. (Ex. 11.)

45. Plaintiff sent Shellpoint written notices of error in July 2024 (which Shellpoint states it received on July 8 and July 19, 2024), on or about October 1,

2024, and on September 14, 2026. Shellpoint acknowledged receiving each notice; for the 2024 notices, it requested additional time to respond (Ex. 8); and it responded to each in writing (Ex. 7; Ex. 11).

46. On February 10, 2026, Plaintiff sent BNY Mellon, by certified mail, written notice of the servicing errors described above and a demand that they be corrected and that Plaintiff be compensated. BNY Mellon did not respond.

**E. Harm to Plaintiff**

47. As a result of Defendants' conduct, Plaintiff has suffered actual damages, including: the $146.00 in property-inspection fees assessed and collected from his funds; the loss of use of $1,539.33 for twelve months, and of other funds held as unapplied; postage, copying, and other costs of continuing to dispute the account after Shellpoint failed to correct the error, including his complaints to the Consumer Financial Protection Bureau and the Florida Office of Financial Regulation; harm to his credit standing from Shellpoint's reports of delinquency, including a January 16, 2026 notice from his homeowner's insurer identifying a "reported delinquency status" and "30 day late payments" among the factors affecting his insurance premium; and time spent correcting Defendants' errors.

48. Plaintiff has also suffered emotional distress, including anxiety, stress, and loss of sleep, from default and cure notices threatening acceleration and

foreclosure of his home, and from repeated "no record of your payment" messages, all sent while he was paying every month.

**COUNT I**

**Violation of RESPA, 12 U.S.C. § 2605(e) and (k), and 12 C.F.R. § 1024.35**

*(Against Shellpoint)*

49. Plaintiff incorporates paragraphs 1 through 10, 12 through 45, 47, and 48 above.

50. Plaintiff's loan is a "federally related mortgage loan" under 12 U.S.C. § 2602(1), secured by a first lien on residential real property. Shellpoint is a "servicer" under 12 U.S.C. § 2605(i)(2) and 12 C.F.R. § 1024.2(b).

51. Plaintiff's written correspondence received by Shellpoint on July 8 and July 19, 2024; his written notice sent on or about October 1, 2024; and his written notice of September 14, 2026, each identified Plaintiff, his loan, and the errors he believed had occurred, including the misapplication of payments and improper late charges and fees. Each was a qualified written request under 12 U.S.C. § 2605(e)(1)(B) and a notice of error under 12 C.F.R. § 1024.35(a). Shellpoint treated each as such by acknowledging it, invoking extensions of time, and responding to it.

52. Shellpoint violated 12 U.S.C. § 2605(e)(2) and (k)(1)(C) and (E), and 12 C.F.R. § 1024.35(e)(1), by failing to correct the misapplication of Plaintiff's

March 29, 2024 payment, or to conduct a reasonable investigation, in response to the July 2024 correspondence. That correspondence asserted covered errors, including the misapplication of payments and the assessment of improper charges. 12 C.F.R. § 1024.35(b)(2), (b)(5). Shellpoint's August 27, 2024 response identified the principal posting, yet treated the loan as due for both the July 1 and August 1, 2024 installments; Shellpoint later reversed that same posting as an error. Shellpoint also violated 12 U.S.C. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) by reporting the loan as past due for July 2024 to consumer reporting agencies within 60 days after receiving that correspondence, which disputed Plaintiff's payments.

53. Shellpoint violated 12 U.S.C. § 2605(e)(2) and (k)(1)(C) and (E), and 12 C.F.R. § 1024.35(e)(3), by failing to respond to Plaintiff's October 2024 notice within the time allowed, and by failing to correct the error until March 31, 2025. After the December 6, 2024 deadline passed without a response or correction, Shellpoint charged Plaintiff further inspection fees of $17.00 (December 20, 2024), $30.00 (January 9, 2025), and $30.00 (February 10, 2025), totaling $77.00.

54. Shellpoint violated 12 U.S.C. § 2605(k)(1)(E) and 12 C.F.R. § 1024.35(e)(1) by failing to conduct a reasonable investigation of Plaintiff's September 14, 2026 notice and by responding with an inaccurate statement that no late fees remained outstanding, while its own records showed $731.20, and without correcting the inspection fees caused by the March 2024 posting error. Those fees,

including the April 15, 2025 fee charged when the account was at most seven days past due, were charges a servicer lacks a reasonable basis to impose under 12 C.F.R. § 1024.35(b)(5), and a reasonable investigation would have reversed them.

55. As a direct result, Plaintiff suffered actual damages, including: property-inspection fees of $133.00 charged after Shellpoint's August 27, 2024 response failed to correct the error (October 24, 2024 through April 15, 2025)—fees that would not have been incurred had Shellpoint reversed the posting in August 2024, as it later did, because the loan would then have been fewer than 30 days past due; continued default treatment and foreclosure warnings; harm to his credit standing from delinquency reporting during the protected 60-day period; loss of use of his funds until March 31, 2025; the costs of further disputes; and emotional distress.

56. Shellpoint's failures in response to three separate notices over more than two years—failing to correct the error in 2024, reporting Plaintiff as late during the protected 60-day period, responding late to the October 2024 notice, and responding inaccurately in 2026—show a pattern or practice of noncompliance, entitling Plaintiff to additional damages of up to $2,000 under 12 U.S.C. § 2605(f)(1)(B).

WHEREFORE, Plaintiff demands judgment against Shellpoint for actual damages, additional statutory damages of up to $2,000 under 12 U.S.C. § 2605(f)(1)(B), costs, and such other relief as the Court deems just.

**COUNT II**

**Breach of Contract (Note and Mortgage)**

*(Against BNY Mellon)*

57. Plaintiff incorporates paragraphs 6 through 40, 42 through 44, 46, and 47 above.

58. The Note and Mortgage are valid, enforceable contracts. BNY Mellon owns the loan and holds the lender's rights and obligations under them. BNY Mellon performs those obligations through its loan servicers, SLS and Shellpoint, whose acts in servicing the loan are BNY Mellon's acts under the contract.

59. Plaintiff substantially performed his obligations under the Note and Mortgage by making a payment every month. Four payments debited February 29 through May 30, 2024, were $56.04 short after an escrow increase. Plaintiff cured that shortfall, and the account was brought current on April 10, 2025. The shortfall was immaterial and did not cause the breaches below.

60. BNY Mellon, through its servicers, breached the Note and Mortgage by: (a) applying $1,539.33 of Plaintiff's regular March 29, 2024 payment to principal as a prepayment that Plaintiff never designated, in violation of Section 5

of the Note and Section 2 of the Mortgage; (b) assessing and collecting property-inspection fees that were not reasonably incurred "for the purpose of protecting Lender's interest in the Property" in connection with a default, as Section 14 of the Mortgage requires—namely, the April 15, 2025 fee, charged when the account was at most seven days past due and far below Shellpoint's own 45-day inspection standard, and the earlier fees, which resulted from the delinquency created by the misapplication; and (c) holding between $1,568.03 and $1,604.19 of Plaintiff's funds as unapplied for about nine months, from July 2024 until March 31, 2025, without applying them or returning them within a reasonable time as Section 1 of the Mortgage requires. Had the $1,539.33 been held with those funds rather than posted to principal, the held funds would have exceeded a full installment and were required to be applied. Mortgage § 1; 12 C.F.R. § 1026.36(c)(1)(ii).

61. Plaintiff satisfied Section 20 of the Mortgage by giving written notice of these breaches to BNY Mellon's servicer in July 2024, October 2024, and September 2026, and to BNY Mellon itself by certified mail on February 10, 2026, and by allowing more than a reasonable time for corrective action. Each notice identified the misapplied payment and the resulting charges and asked that they be corrected; BNY Mellon's servicer received the notices and responded to them, and BNY Mellon received the February 10, 2026 notice; neither corrected the breaches.

All conditions precedent to this action have been performed, have occurred, or have been waived.

62. As a direct result of these breaches, Plaintiff suffered damages, including the property-inspection fees collected from his funds and the loss of use of his money. Plaintiff does not seek emotional-distress damages under this Count.

WHEREFORE, Plaintiff demands judgment against BNY Mellon for damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just.

## COUNT III

### Violation of the Florida Consumer Collection Practices Act, Fla. Stat. § 559.72(9)

*(Against Shellpoint)*

63. Plaintiff incorporates paragraphs 6 through 10, 12 through 17, 20 through 45, 47, and 48 above.

64. Plaintiff is a "debtor" or "consumer" under Fla. Stat. § 559.55(8). The mortgage loan is a "debt" or "consumer debt" under Fla. Stat. § 559.55(6) because it was incurred for personal, family, or household purposes and is secured by Plaintiff's home. Shellpoint is a "person" subject to Fla. Stat. § 559.72.

65. Fla. Stat. § 559.72(9) prohibits any person, in collecting a consumer debt, from claiming, attempting, or threatening to enforce a debt when that person

knows the debt is not legitimate, or asserting a legal right when that person knows the right does not exist.

66. Shellpoint's own stated policy is to inspect a property only when a loan is 45 days delinquent. Shellpoint knew, no later than August 27, 2024, that the loan was carried beyond about 30 days delinquent only because SLS had posted $1,539.33 of Plaintiff's regular payment to principal, and on March 31, 2025, Shellpoint itself reversed that posting as an error. Shellpoint knew that the April 15, 2025 inspection fee was not legitimate: its own records showed the account was then at most seven days past due, far below its own 45-day inspection standard, about two weeks after it had itself corrected the posting. A property-inspection fee charged to a borrower who is not in a delinquency status that would justify it is not a bona fide fee. 12 C.F.R. pt. 1024, Supp. I, cmt. 35(b)-2. Shellpoint also knew that the earlier property-inspection fees were not legitimate, because they were triggered only by the extra delinquency created by a posting it had itself identified and later reversed as an error.

67. Within two years before this action, Shellpoint nevertheless collected those fees, by applying $146.00 of Plaintiff's unapplied funds to property-inspection fees on August 29, 2025.

68. As a direct result, Plaintiff suffered actual damages, including the $146.00 collected from his funds and emotional distress.

WHEREFORE, Plaintiff demands judgment against Shellpoint for actual damages, statutory damages of up to $1,000 under Fla. Stat. § 559.77(2), costs, and such other relief as the Court deems just.

**PRAYER FOR RELIEF**

Plaintiff respectfully asks the Court to enter judgment in his favor and award:

A. Actual damages against Shellpoint and BNY Mellon, in amounts to be proven;

B. Additional statutory damages of up to $2,000 against Shellpoint under 12 U.S.C. § 2605(f)(1)(B);

C. Statutory damages of up to $1,000 against Shellpoint under Fla. Stat. § 559.77(2);

D. Pre- and post-judgment interest and costs; and

E. Such other relief as the Court deems just and proper.

Dated: October 19, 2026.

Respectfully submitted,

Kirti Makati

Kirti M. Makati, Pro Se Plaintiff
14314 North Boulevard
Tampa, Florida 33613
Telephone: (813) 966-5757
Email: makatikm@gmail.com